UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| RACHEL R. SCHANZENBACH,<br>*Plaintiff*,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br>*Defendant*. | Civil No. 1:18-cv-00967-AJT-MSN |

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 13 and 14). Plaintiff Rachel R. Schanzenbach seeks judicial review of the final decision of defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, denying her claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). Alternatively, plaintiff moves for an order remanding the instant appeal to the Social Security Administration ("SSA") for a new administrative hearing pursuant to § 405(g). For the reasons stated below, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 13) be DENIED, defendant's Cross-Motion for Summary Judgment (Dkt. No. 14) be GRANTED, and defendant's final decision be AFFIRMED.

## I.   Procedural and Factual History

Plaintiff applied for disability insurance benefits on March 2, 2015 alleging disability beginning May 15, 2007. Administrative Record ("AR") at 10. Plaintiff's application was denied on April 20, 2015 and again upon reconsideration on June 29, 2015. *Id.* At plaintiff's request, a hearing was held on May 1, 2017 before Administrative Law Judge ("ALJ") Andrew M. Emerson.

*Id.* Both plaintiff, represented by an attorney, and a Vocational Expert ("VE") testified. *Id.* at 28-69. On June 29, 2017, the ALJ issued a decision finding that plaintiff was not disabled. *Id.* at 10-20. On June 14, 2018, the Appeals Council for the Office of Disability and Adjudication denied plaintiff's request for further administrative review and notified her that the ALJ's decision stood as the Commissioner's final decision. *Id.* at 1-3.

Having exhausted her administrative remedies, plaintiff filed a Complaint (Dkt. No. 1) on August 6, 2018 challenging the ALJ's decision. Plaintiff filed a Motion for Summary Judgment (Dkt. No. 13) on January 25, 2019, to which the Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 14) on February 22, 2019, along with a Memorandum in Support of Defendant's Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment (Dkt. Nos. 15 and 16). Accordingly, the parties' motions are ripe for disposition. The relevant period for the instant action is between May 15, 2007, the alleged onset date, and the date last insured, December 31, 2007 ("relevant period").[1] AR at 11. Plaintiff alleged the following impairments: mitochondrial myopathy; dysautonomia; autism spectrum disorder; major depressive disorder; and general anxiety disorder. *Id.* at 70. Below is a summary of the relevant medical evidence, state agency opinion evidence, and testimony from the administrative hearing.[2]

**a.   Relevant Medical Evidence**

The sole treatment note from the relevant period is plaintiff's phone consultation with Dr. John Hart, M.D., on September 14, 2007. AR at 1406. On the call, plaintiff told Dr. Hart that she reported positive for Lyme disease. *Id.* She further reported that both her digestion and sleep were improving; however, she was "sore all the time," it hurt "to hold her head up," and her neck

---

[1]     A claimant must establish disability on or before the date last insured in order to be entitled to disability insurance benefits. 42 U.S.C.A. § 416(i).

[2]     Additionally, plaintiff's husband wrote a letter in support of his wife's disability claim. *See id.* at 1425.

ached. *Id.* Without seeing plaintiff, Dr. Hart discussed antibiotic recommendations, but plaintiff was not interested in antibiotics and instead wanted to discuss other herbal antibiologics. *Id.* There are no other medical records from 2008, 2009, or much of 2010.

Between 2010 and 2016, plaintiff saw several doctors, most of whom found plaintiff to be relatively healthy. *See, e.g.,* AR at 1377 (Dr. Henry Linder treatment notes from May 11, 2011 stated that plaintiff showed improvements to the extent she could socialize again, including "driving with [her] children"); *id.* at 964 (Dr. Howard Glick's treatment notes from April 22, 2013 stated that plaintiff "is doing well"); and *id.* at 343 (Dr. Frederick Lillis' treatment notes from March 10, 2014 found that plaintiff "is doing well" and that her symptoms and pain are "controlled"). Doctors Seth Tuwiner, Virgil Balint, and Fran Kendall also treated plaintiff between 2011 and 2016; plaintiff relies heavily on their opinions in her motion.

Dr. Tuwiner began treating plaintiff in October 2011. *Id.* at 1422. In a letter dated April 14, 2017, Dr. Tuwiner stated that he felt strongly that plaintiff "had a progressive muscle disease for >5 years." *Id.* at 1422. He explained that plaintiff "suffered from her condition and the frustration of not coming up with a diagnosis" and, after genetic testing, she was diagnosed with a "rare mitochondrial muscle disorder with systemic manifestations." *Id.* Although he found that plaintiff "improved with appropriate treatment," he ultimately concluded that plaintiff had been disabled for many years and was still "disabled." *Id.*; *but see id.* at 967-68 (finding that plaintiff was doing well at a follow-up visit one month later on May 3, 2017, because plaintiff was well-nourished, well-groomed, and did not have apparent distress, despite plaintiff's report that she still had "muscle pain and fatigue with significant exertion").

Plaintiff visited Dr. Balint in September 2012 for complaints of muscle pain. *Id.* at 478. Plaintiff told Dr. Balint that she has felt "continuous" and "severe" pain throughout her body since

2006. *Id.* She came to the appointment with a "very thick stack of medical records from multiple physicians," which reflected normal tests. *See, e.g., id.* ("MRI of the brain is normal. MRI of the bilateral lower extremety [sic] is consistent with muscular edema and atrophy. EMG of the upper and lower extremities is consistent with chronic myopathy. ANA and other rheumatoid factors are all negative."). Dr. Balint's physical examination was generally normal, including normal balance, gait, posture, muscle bulk/tone, and her lower and upper extremities all showed close to full strength. *Id.* at 480. Dr. Balint further found that plaintiff did not have a "definitive diagnosis for her symptoms." *Id.* at 481.

Lastly, Dr. Kendall treated plaintiff three times between 2013 and 2014. *See id.* at 295, 321, 327. In October 2013, plaintiff self-reported that she cannot climb stairs or perform other activities of daily living, such as driving, and has required a caregiver since 2006. *Id.* at 321. Dr. Kendall discussed various diagnostic possibilities that may have caused her symptoms and suggested various tests. *Id.* at 324. Plaintiff did not return to see Dr. Kendall until one year later; in October 2014, Dr. Kendall conducted a physical examination, which was generally normal. *Id.* at 298 (finding her affect was "normal and appropriate," her mucosa was "pink and moist," her pharynx "without erythema or injection," her "TMs and canals [were] normal bilaterally with normal light reflex and no erythema," her neck was "supple without significant lymphadenopathy or thyromegaly," her chest "CTA [was] normal," her abdomen was "soft & non-tender," her extremities did not show "cyanosis, clubbing, or edema but some mottling and coolness to touch," and her reflexes were "normal"). Despite normal examination results, Dr. Kendall concluded that plaintiff had myopathy, progressive weakness, pain, fatigue, hypothyroidism, Asperger syndrome, anxiety, and major depressive episodes. *Id.* In February 2014, Dr. Kendall confirmed the same results. *Id.* at 327-31.

On July 17, 2015, Dr. Kendall wrote a letter describing plaintiff's medical history. *Id.* at 485-87. Based on plaintiff's self-reported statements, as well as the results of a skin biopsy showing that she had a partial mitochondrial respiratory chain, Dr. Kendall concluded that plaintiff's "problems are life-long and have been clinically relevant for over a decade . . . and will not resolve and will require ongoing treatment." *Id.* at 486. Because there is no cure for plaintiff's disorder, Dr. Kendall found that she will not show any significant improvements and should receive support because her disease "renders her incapable of age appropriate functioning and independence with NO hope for recovery to normal functionality." *Id.* at 487.

**b.      State Agency Consultants' Opinion Evidence**

On April 16, 2015, state agency expert physician Dr. Jack Hutcheson reviewed the record and found that most of the evidence pertained to plaintiff's treatments after the date last insured and that the available "evidence for the relevant period [is] not enough to make a determination on the [] claim." AR at 76. Therefore, Dr. Hutcheson found that plaintiff's claim should be denied for insufficient evidence. *Id.* Upon reconsideration, Dr. James Darden reviewed the record on June 23, 2015, and arrived at the same conclusion, finding that there was insufficient evidence in the record to show that plaintiff was disabled prior to the date last insured. *Id.* at 87.

**c.      Administrative Hearing**

On May 1, 2017, the ALJ heard testimony from plaintiff, appearing with an attorney, and the VE. AR at 26. At the outset, the ALJ informed plaintiff that she would solely be testifying about her functioning between May 15, 2007, her alleged onset date, and December 31, 2007, her date last insured. *Id.* at 30. The ALJ further stated that it seemed likely that her chronic condition had "gotten worse but [he] can't consider [her] current condition." *Id.* at 31. The ALJ further reinforced that the social security process is not a diagnosis driven program but instead focuses

solely on functioning. *Id.* at 31-32.

Plaintiff testified that she completed three years in college, where she held three different jobs. *Id.* at 51. First, she was a resident assistant, where she assisted students with residence- and school-related questions. *Id.* at 60. Second, she was a facility worker for a lodge where she would do laundry, make the beds, clean bathrooms, and vacuum the carpet. *Id.* at 61. Lastly, she was a call center attendant where she would do administrative tasks. *Id.* at 33. Outside of these positions, she has not performed any work since 2002, except for some volunteer work. *Id.* at 33-34.

Around May 2007, plaintiff reported that she became too ill to take care of her children and thus moved in with her husband's family. *Id.* at 34-35. When she lived with her in-laws, she engaged in few social activities. *Id.* at 36. She attended church but was unable to visit with many people because she was "stuck at [her] in-laws house," which was in a secluded area. *Id.* During this period, plaintiff stopped cooking, grocery shopping, washing dishes, and doing laundry, among other household chores. *Id.* at 46-47.

Plaintiff described experiencing various issues involving fatigue, muscle strength, and concentration. For example, she could only sit for 45 minutes and then would have to lay down. *Id.* at 42. Similarly, she could probably stand for about 15 or 20 minutes but then would have to sit down for 5 to 10 minutes. *Id.* at 43. Plaintiff could still climb stairs and lived in a split-level home, but sometimes she would crawl on all fours to conserve energy. *Id.* Plaintiff said she was able to carry around 20 pounds during the relevant time. *Id.* at 41. She also stated that she had trouble reaching over her head and using her hands and fingers: she used to do all of the cooking but stopped because she was losing control of her motor functions. *Id.* at 44-45. Lastly, plaintiff "began to have a lot of trouble with losing [her] train of thought and with being able to remember words." *Id.* at 45. However, she was able to read, write letters to her friends and family, and use a

computer. *Id.* at 50-51. She was also able to engage in very limited social interactions. *Id.* at 46.

The VE testified next, characterizing plaintiff's prior employment as a general clerk as semiskilled work at a light exertional level; as a housekeeper as unskilled work at a light exertional level; and as a resident assistant as unskilled work at a light exertional level.[3] *Id.* at 61. The ALJ asked the VE to consider various scenarios involving an individual of the same age, education, and work experience as plaintiff who "can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl", "can never climb ladders, ropes and scaffolds", and would need to avoid concentrated exposure to extreme cold, heat, wetness, excessive vibration, and hazardous moving machinery and unprotected heights ("hypothetical individual"). *Id.* at 61-62.

First, the ALJ asked the VE if such this hypothetical individual could perform plaintiff's past work as it was actually or customarily performed in the national economy if she were limited to medium work. *Id.* at 62. The VE said that the individual could perform all of her jobs, as well as the following positions: a linen room attendant; a sandwich maker; and a counter supply worker. *Id.* Second, the ALJ asked the VE to consider whether the same hypothetical individual could perform plaintiff's past work if limited to light work. *Id.* at 63. The VE responded that such an individual could perform her past work, as well as the following positions: marker; office helper; and ticket taker. *Id.* Lastly, the ALJ asked the VE to consider whether this hypothetical individual would be able to perform plaintiff's past work if limited to sedentary work. *Id.* at 63-64. The VE responded that such an individual would not be able to perform plaintiff's past work but would be able to perform other positions at a reduced sedentary exertional level, including: clerk; document preparer; and table worker. *Id.* at 64.

---

[3] These exertion levels are defined using an SSA classification system. This system defines the functional requirements of work in terms of the range of the primary strength activities required (that is, sedentary, light, medium, heavy, and very heavy).

Plaintiff's attorney also questioned the VE. He first asked whether an individual who had to nap for two-and-a-half hours during the day could perform any of her past employment. *Id.* at 65. The VE responded no. *Id.* Plaintiff's attorney further asked whether a need for 30 minutes of rest after a normal meal would impact a person's ability to work. *Id.* The VE responded that such a person would typically be "precluded from employment," and that if plaintiff were off task more than 15% of an eight-hour work day, she would be precluded from work. *Id.* at 66. The VE stated that if plaintiff were off task 70 or 80 minutes per day, she would be precluded from all jobs. *Id.* at 66-67.

## II.    Standard of Review

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's Residual

8

Functional Capacity ("RFC"), meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

In this case, the ALJ found plaintiff not disabled and denied her application for benefits. *Id.* at 11-20. Under the first step, the ALJ found that plaintiff did not engage in any SGA from her alleged onset date of May 15, 2007 through December 31, 2007, the date plaintiff was last insured. *Id.* at 12. At step two, the ALJ determined that plaintiff had the following severe physical impairments: Lyme disease, acquired selective IgA immune deficiency, and babesiosis, but that plaintiff's other diagnoses were not severe physical impairments, including gluten intolerance, vitamin D deficiency, chronic fatigue, and chemical insensitivity. *Id.* at 13. Additionally, the ALJ found that plaintiff's diagnoses of partial deficiency of complex III and IV of the mitochondrial respiratory chain and dysautonomia were non-medically determinable impairments, or in the alternative, were non-severe impairments. *Id.* at 13-14. The ALJ also concluded that plaintiff's mental diagnoses of major depressive disorder, generalized anxiety disorder, and Asperger's disorder/autism were non-medically determinable impairments, or in the alternative, were non-severe impairments. *Id.* at 14. Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.*

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. The ALJ considered plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms, but determined that those statements were not consistent with the objective medical evidence and other evidence in the record. *Id.* at 14-15. Reviewing the entire record, the ALJ concluded that plaintiff had the RFC to perform the full range of sedentary work, except she could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never

climb ladders, ropes, and scaffolds; and was to avoid concentrated exposure to extreme cold, heat, wetness, excessive vibration, hazardous moving machinery and unprotected heights. *Id.*

Under steps four and five, the ALJ found that plaintiff did not have past relevant work because "there is no evidence that the claimant performed any of the three positions for earnings at a level that constituted [SGA]." *Id.* at 18. Moreover, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in the national economy that she could perform, including: information clerk; document preparer; and table worker. *Id.* at 19. Based on the foregoing analysis, the ALJ concluded that plaintiff was not disabled as defined by the Act. *Id.*

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589.

When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be

affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

## III.  Analysis

Plaintiff argues that the ALJ erred in his assessment of (1) the severity of her medical impairments, (2) her RFC, (3) her credibility as to her exertional limitations, and (4) the medical and vocational opinion evidence. Pl. Br. (Dkt. No. 13) 3. Defendant moves for summary judgment on the basis that the ALJ's decision is supported by substantial evidence in the record. *See generally* Def. Opp'n (Dkt. No. 15). For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Cross-Motion for

11

Summary Judgment, and affirming the ALJ's decision.

### a.    Medical Impairments

Plaintiff alleges that the ALJ erred by concluding that her mitochondrial myopathy was not a medically determinable impairment or, in the alternative, that it was not a severe impairment. Pl. Br. (Dkt. No. 13) 9-10. The Act defines disability in terms of the effect a physical or mental impairment has on a claimant's ability to function in the workplace. *See Sullivan v. Zebley*, 493 U.S. 521, 528 (1990) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)). The claimant bears the burden of proving disability under a two-fold test: first, the claimant must prove that she has a medically determinable impairment; and, second, the claimant must show that the impairment is so severe that it prevents her from engaging in any substantial gainful activity existing in the national economy. *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1512(a). "An individual shall not be considered to be under a disability unless she furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." 42 U.S.C. § 423(d)(5)(A).

### 1.    Medically-Determinable Impairment

In the instant case, the ALJ found no evidence of a diagnosis of mitochondrial myopathy prior to her date last insured, December 31, 2007. AR at 13. During the relevant period of May through December 2007, plaintiff had only one medical treatment note: a phone consultation with Dr. Hart, during which plaintiff complained of generalized muscle pain but reported improvements in her digestion and sleep. *Id.* at 1406. Dr. Hart notes a diagnosis of Lyme disease and food allergies but makes no reference to physical limitations or inability to perform daily activities. *Id.* His recommendations to plaintiff included taking antibiotics (which she did not) and returning for a follow-up visit in one month (which she did not). *Id.; see also Dunn v. Colvin*, 607 F. App'x 264, 274-75 (4th Cir. 2015) (conservative nature of treatment is relevant to determining severity of

alleged impairment). Plaintiff's medical record contains no other treatment notes from the relevant period.

Plaintiff concedes that her mitochondrial myopathy was diagnosed after her date of last insured, but argues that she has suffered from this genetic disorder throughout her entire life. Pl. Br. (Dkt. No. 13) 11-12. In support, plaintiff relies on Social Security Ruling ("SSR") 83-20, which states that with respect to "slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling . . . [and in] such cases, it will be necessary to infer the onset date from the medical and other evidence that describes the history and symptomology of the disease process." *Id.* at 10. Plaintiff argues that the ALJ should have inferred an onset date within the relevant period of May to December 2007 based on Dr. Kendall's July 17, 2015 assessment, *i.e.* that plaintiff's "problems began during her first pregnancy and that she has shown progressive problems since that time," which have been "clinically relevant for over a decade since the early 2000's," are "life-long," will not resolve, and will require "ongoing treatment." AR at 485-86.

This court has found that the mere existence of a condition during the relevant period is not enough to find a medically determinable impairment, even when the symptoms of that condition later become disabling after the relevant period. *See, e.g., Hill v. Astrue,* 744 F. Supp. 2d 777, 781 (E.D. Va. 2011) (Finding that none of the medical evidence indicated that the plaintiff had an impairment, until after the relevant period had ended). Moreover, plaintiff's reliance on SSR 83-20 is misplaced because that ruling only applies in cases where the ALJ has already made a finding of disability and then must resolve the question of the onset date. *See id.* at 790 ("SSR 83-20 only would apply if the ALJ completed the five-step sequential analysis [], concluded that [the plaintiff] was disabled, and needed to resolve the question of onset date."). Here, the ALJ did

13

not conclude that plaintiff was disabled.

Contrary to plaintiff's assertion, and as the ALJ correctly stated at the administrative hearing, "Social Security disability is not a diagnosis driven program," but is instead concerned with a claimant's functioning. *See* AR at 31-32. Even if plaintiff's mitochondrial myopathy had been diagnosed prior to her alleged onset date, she would still be required to prove that, on or before December 31, 2007, she had disabling functional limitations that derived directly from that impairment. As discussed below, plaintiff has failed to do so.

### 2. Severity of Impairment

Alternatively, the ALJ found that even if plaintiff's mitochondrial myopathy had been medically-determinable within the relevant period, it did not constitute an impairment so severe that it prevented her from engaging in any substantial gainful activity existing in the national economy. AR at 13; *see* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1512(a). Specifically, the ALJ found that (1) there is no evidence that plaintiff "received any treatment in 2008, 2009, or 2010, the three years immediately following her date last insured," and (2) plaintiff's activities of daily living after the relevant period did not support the reported severity of her impairment. AR at 13.

Plaintiff argues that her delayed diagnosis "does not mean [the disorder] has not been disabling for many years prior." Pl. Br. (Dkt. No. 13) 11. While that may be true, plaintiff must still supply evidence that it <u>has</u> been disabling during the relevant period; she fails to do so. In support of her claim of disability, plaintiff points to her subjective hearing testimony describing her limitations, *id.* at 43-50; her husband's letter recounting the same, *id.* at 1425-26; and Dr. Kendall's July 2015 letter asserting plaintiff's severe limitations in and before 2007, without first-hand knowledge or medical records from that time, *id.* at 485-87.[4] Yet, despite the severity of

---

[4] Each of these is discussed more fully in the credibility analysis, *infra* p. 18.

the pain and limitations described in this evidence, plaintiff offers no explanation for why she sought treatment only *once* during the relevant period and *once* in the three years immediately after. Moreover, evidence in the record regarding plaintiff's daily activities during the relevant period contradicts her subjective complaints. During this period, she homeschooled her children, attended church services regularly, performed some housework, read to her children, created Christmas stockings for her family, used the computer to write to family and friends, and fed and dressed herself. Def. Opp'n (Dkt. No. 15) 4-5.

Plaintiff's functional abilities after her date last insured are also instructive. In addition to the activities listed above, plaintiff exercised with a friend, participated in yoga exercises, and illustrated books, which she described as involving "lots of deadlines." Def. Opp'n (Dkt. No. 15) 5. If, as plaintiff asserts, her mitochondrial myopathy is a progressive disorder, then her functional limitations after December 2007 would be more, not less, severe. *See id.* at 485-86 (Dr. Kendall's letter stating that plaintiff's disorder "causes progressive impairment of various body functions" and that plaintiff "has shown progressive problems" since her first pregnancy); *id.* at 1422 (Dr. Tuwiner stating that he felt strongly that plaintiff "had a progressive muscle disease for >5 years"). Instead, the ALJ found that the evidence in the record after the relevant period, including both medical examinations and daily activities, were also inconsistent with plaintiff's subjective complaints. *Id.* at 16 (noting medical evaluations from 2012 and 2015 that showed normal gait, active and passive range of motion, strength in extremities, etc.); *id.* (noting post-2007 evidence that plaintiff attended church, did artwork, read, wrote, homeschooled her children, etc.). This led the ALJ to conclude that plaintiff's functional abilities "were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.*

This Court does not undertake to reweigh the evidence. *Hancock*, 667 F.3d at 472. As

such, the undersigned finds that there is substantial evidence in the record to support the ALJ's determination that plaintiff's mitochondrial myopathy was not medically-determinable and/or not a severe impairment as of December 31, 2007.

### b.      Residual Functional Capacity ("RFC")

Next, plaintiff challenges the ALJ's assessment of her credibility and of the medical opinion evidence in the record. Pl. Br. (Dkt. No. 13) 11-17. The RFC determination is an assessment of the most that a claimant can do despite the limitations caused by her impairments. *See* C.F.R. 404.1545(a)(3). When the record contains a claimant's subjective statements about her symptoms, the ALJ must determine the credibility of those statements and explain his reasoning. 20 C.F.R. § 404.1529(a).  Similarly, when the record contains medical opinion evidence, the ALJ must weigh such evidence and explain his reasoning. 20 C.F.R. § 404.1527(b)(2). Where the ALJ does so, and his conclusions are supported by substantial evidence in the record, his decision may not be disturbed by the reviewing court. *See Craig*, 76 F.3d at 589.

### i.      Credibility

Plaintiff argues that the ALJ's assessment of her credibility concerning the intensity, persistence, and limiting effects of her symptoms, as well as her exertional and non-exertional limitations, was erroneous. Pl. Br. (Dkt. No. 13) 15-16. When evaluating a claimant's subjective statements about her impairments and symptoms, the ALJ must (1) consider the objective medical evidence to determine whether the claimant's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged," and (2) evaluate the "intensity and persistence" of plaintiff's symptoms to determine the extent to which her symptoms limit her capacity for work. *See* 20 C.F.R. §§ 404.1529, 416.929. At the second step, the ALJ must "assess

16

the credibility of the claimant's statements about [his or her] symptoms and their functional effects." *Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529 (c)(4), 416.929(c)(4)). In this case, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that plaintiff's statements regarding the extent to which the alleged symptoms affected her ability to work were inconsistent with the medical and other evidence in the record. AR at 15.

At step one, plaintiff argues that the ALJ improperly attributed her limitations—generalized musculoskeletal pain and weakness, chronic fatigue, and her testimony regarding her sitting and standing limitations—to her diagnoses of Lyme disease, acquired selective immune deficiency, and babesiosis, and "willfully ignore[d] the obvious source of these symptoms," *i.e.* her mitochondrial myopathy. Pl. Br. (Dkt. No. 13) 18. However, as the ALJ stated at the administrative hearing, the Social Security system "is not a diagnosis driven program" but instead looks at functioning. AR at 31-32. *See also* 20 C.F.R. § 404.1529(c)(3) ("The finding that your impairment(s) could reasonably be expected to produce your pain or other symptoms does not involve a determination as to the... functionally limiting effects of your symptoms").

In other words, whether the ALJ had attributed plaintiff's limitations to Lyme disease or mitochondrial myopathy is irrelevant because the ALJ found that plaintiff's impairments "*could reasonably be expected to cause the alleged symptoms.*" AR at 15 (emphasis added). The relevant question before the ALJ was whether plaintiff's statements regarding the extent to which the alleged symptoms affected her ability to work were consistent with the medical and other evidence in the record; he found that they were not. AR at 15. Plaintiff points to no evidence regarding functional limitations (associated either with her mitochondrial myopathy or

17

other impairments) within the relevant period of May to December 2007.

Plaintiff argues that the ALJ's reliance on the examinations of Dr. Hart and Dr. Balint are essentially "straw-man arguments" because they examined her without fully understanding her disorder. Pl. Br. (Dkt. No. 13) 17. However, she fails to explain how a diagnosis of mitochondrial myopathy would have changed the doctors' evaluations. For example, although plaintiff *self-reported* to Dr. Baliant that she felt continuous pain in her entire body, his physical examination yielded essentially normal results. *Id.* at 479-80 (finding that plaintiff "is alert, awake, and oriented to person, place, and time. Her mood and affect are pleasant and appropriate. She demonstrates good attention span and concentration. She has a non-antalgic gait pattern"). Likewise, Dr. Hart's treatment notes do not reflect any discussion or determination of physical limitations that would render plaintiff disabled. AR at 1406. Moreover, plaintiff's failure to follow-up with Dr. Hart "suggests that the severity of her symptoms [at that time] were not as severe as alleged." *Id.* at 16.

When an ALJ makes a credibility determination, he must "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, [and] statements . . . by treating or examining physicians." *Ladda v. Berryhill*, 749 Fed. Appx. 166, 170 (4th Cir. 2017) (citing SSR 96-7p at *1). In this analysis, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible." *Id.* (citing *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017) (internal quotations and alterations omitted).

Here, the ALJ acknowledged plaintiff's subjective complaints about her pain. *See, e.g., id.* at 43-50 (testifying that she has to lay down for every 45 minutes of sitting; has to sit for every 15 to 20 minutes of standing; has to crawl up stairs; has trouble with fine motor movements; frequently loses her train of thought; feels anxious, ill, and has physical reactivity around other

people; is unable to shop for groceries or do laundry, vacuum, or sweep; and requires constant help in caring for her children). Nonetheless, the ALJ found that the "rare treatment during the relevant period" and the "significant gaps in [her] history of treatment for the three years immediately following her date last insured" suggested that her symptoms were not as severe as she alleged. AR at 15. The ALJ also considered other medical records well after the date last insured to conclude that plaintiff's statements were inconsistent with the record. *See, e.g., id.* at 480 (reflecting examination notes from plaintiff's visit with Dr. Balint in September 2012, where a physical examination showed: normal posture, muscle bulk/tone, standing balance, gait, and posture; no lumbar shift, abnormal curvature, or tenderness or trigger points for various muscles; and normal active and passive range of motion, deep tendon reflexes, and sensation by light touch for upper and lower extremities).

Plaintiff argues that the opinions of Dr. Kendall and Dr. Tuwiner in 2015 and 2017, which stated that her symptoms "reach back far into her past," undermine the ALJ's reliance on the significant gaps in her treatment history during and immediately after the relevant period. Pl. Br. (Dkt. No. 13) 16-17. Plaintiff's argument is inapposite. Even if mitochondrial myopathy was the reason for her medical issues in the past, this does not change the fact that plaintiff did not see those doctors during the relevant time. Instead, Dr. Tuwiner started treatment with plaintiff in 2011 and Dr. Kendall started treatment with plaintiff in 2013. AR at 321, 1422. Like Dr. Hart and Dr. Balint, these doctors relied on plaintiff's *self-reported* medical history to evaluate her, *id.* at 321 (recounting plaintiff's history of present illness by stating that "her problems began during her first pregnancy and [] she has shown progressive problems since that time"), and noted how plaintiff has improved with medication, *id.* at 1422 (stating that plaintiff "improved with appropriate treatment," but still finding plaintiff disabled). Accordingly, despite plaintiff's

frustration with "her symptomology and inability to find a cause," Pl. Br. (Dkt. No. 13) 17, the record provides support for the ALJ's finding that the single treatment in 2007 demonstrates that plaintiff's symptoms were not as severe as alleged.

Moreover, the ALJ considered plaintiff's activities of daily living subsequent to her date last insured because, "[d]ue to the lack of medical evidence," the ALJ was unable to assess her activities of daily living during the relevant period. *Id.* at 16. The ALJ found that those activities contradicted plaintiff's subjective complaints because she maintained various hobbies. A 2016 medical report noted that she "goes to orthodox Presbyterian church. Her hobbies and social activities includ[e] doing art, reading and writing letters to family. She is busy homeschooling her two children."*Id.* at 1242. In 2015 and 2016, she participated in yoga, planned outings to the park and library, and had hobbies such as music, arts and crafts, reading, writing letters to family, and being outside. Def. Opp'n (Dkt. No. 15) 5.

"Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595. Here, the ALJ discredited plaintiff's statements during her hearing because they were inconsistent with the other evidence in the record, including the lack of treatment, normal examination notes, and plaintiff's ability to perform activities of daily living. As noted above, courts "do not undertake to reweigh...[the] evidence" on appeal. *Hancock*, 667 F.3d at 472. Accordingly, there is substantial evidence in the record to support the ALJ's credibility determination.

### ii.   Medical Opinion Evidence

20

Next, plaintiff argues that the ALJ improperly assigned greater weight to the state agency physicians' opinions over the opinions of Dr. Kendall and Dr. Tuwiner. Pl. Br. (Dkt. No. 13) 19-20. The ALJ has the exclusive duty to evaluate the medical opinions in the record and is not required to accept any medical opinion regarding the nature and severity of a claimant's impairment, including a treating source's opinion, as controlling. 20 C.F.R. § 404.1527; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Fourth Circuit explained that "if a [treating] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Courts "must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence." *Dunn v. Colvin*, 607 Fed. Appx. 264, 271 (4th Cir. 2015). The federal regulations state that "[the SSA] will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3). Accordingly, the ALJ must consider a variety of factors—such as the length and extent of treatment as well as the consistency of the opinion "with the record as whole"—to determine the appropriate weight. *Id.* at § 404.1427(b)-(c).

### 1.   Dr. Kendall's and Dr. Tuwiner's Opinions

The ALJ gave little weight to both the opinions of Dr. Kendall and Dr. Tuwiner because: (1) they began treating plaintiff several years after her date last insured; (2) their opinions were inconsistent with plaintiff's activities of daily living; and (3) "a determination regarding whether a claimant was disabled is reserved to the Commissioner of the Social Security Administration." AR at 17. Plaintiff argues that, based on her genetic disorder, her symptoms started long before her diagnosis of mitochondrial myopathy and, furthermore, her inability to perform activities of daily living are consistent with her "medically-supported" diagnosis. Pl. Br. (Dkt. No. 13) 21. For the reasons that follow, plaintiff's arguments fail.

21

In Dr. Kendall's July 2015 letter, she stated that plaintiff "has been under [her] care since October 2013," which is six years after plaintiff's last date insured, meaning that Dr. Kendall relied on plaintiff's statements about the nature and severity of her symptoms between May and December 2007. AR at 485. Based on her diagnosis of a partial mitochondrial defect and plaintiff's own statements, Dr. Kendall found that plaintiff's "problems are life-long and have been clinically relevant for over a decade since the early 2000's and will not resolve and will require ongoing treatment." *Id.* at 485-86. Dr. Kendall further asserted, without explanation, that plaintiff "should be considered a handicapped and disabled adult in regard to eligibility of various services." *Id.* at 487.

Similarly, Dr. Tuwiner's October 2017 letter stated that he began treating plaintiff in October 2011, four years after plaintiff's last date insured. *Id.* at 1422. Plaintiff told him that she believed she had chronic Lyme disease, however, he disagreed and felt strongly that "she had a progressive muscle disease for >5 years," without further explanation. *Id.* Although Dr. Tuwiner noted that plaintiff "improved with appropriate treatment," he nonetheless opined that it was his opinion that plaintiff "has been disabled for many years since before [he] first evaluated her and after [his] initial evaluation due to her neuromuscular disease with both systemic manifestations and psychiatric comorbidities." *Id.*

Neither doctor evaluated plaintiff until years after her date last insured, thus basing their opinions on her self-reported symptoms, not their own assessments. *Id.* More importantly, neither doctor thoroughly explained how they arrived at their conclusions that plaintiff was disabled. For example, Dr. Kendall provides background information regarding mitochondrial disorders and their debilitating effects; however, she fails to explain plaintiff's functional limitations from the disorder, except for recounting plaintiff's self-reported symptoms. Likewise, Dr. Tuwiner stated

that plaintiff "suffered from her condition and the frustration of not coming up with a diagnosis," but added nothing more regarding her physical limitations. Under similar circumstances, this court has held that an ALJ properly discounts a medical opinion that fails to contain written explanations of their diagnoses. *See, e.g.*, *Cummins v. Colvin*, 2015 WL 1526188, at *3 (E.D. Va. Apr. 2, 2015) ("The implication here is not a distaste for check-the-box forms generally, but for medical reports that do not contain at least a minimal amount of written explanation.").

Additionally, the ALJ correctly concluded that plaintiff's activities of daily living contradicted their opinions. Dr. Kendall stated that plaintiff "can no longer climb stairs readily, cannot complete [activities of daily living] or drive" and "[has] require[d] a caregiver in her home since 2006," and Dr. Tuwiner stated that plaintiff has been "disabled for many years." However, during the same time period, other physicians found that plaintiff could climb stairs and walk independently, *id.* at 624 (May 2016 report); could drive, *id.* at 466 (May 2014 report); and engaged in various daily activities, such as homeschooling her children, attending church, visiting friends, participating in yoga, doing arts and crafts, reading, and writing, among other things, *id.* at 335 (January 2015 report), 616 (May 2016 report), 624 (May 2016 report), 643 (May 2016 report), 707-08 (May 2016 report), 716-17 (May 2016 report). In light of this evidence, the ALJ was justified in discounting the opinions of Dr. Kendall and Dr. Tuwiner based on the contradictions with plaintiff's activities of daily living.

Lastly, the ALJ properly concluded that the opinions of Dr. Kendall and Dr. Tuwiner that plaintiff was "disabled" and "handicapped" was an issue reserved to the Commissioner and, therefore, not entitled to special significance. *Id.* at 17; *see also* C.F.R. § 404.1527(d)(1)-(3). Based on the above, there is substantial evidence in the record to support the ALJ's finding that Dr. Kendall's and Dr. Tuwiner's opinions are not entitled to great weight.

## 2.   State Agency Opinions

Dr. Jack Hutcheson and Dr. James Darden, the state agency physical health consultants, both concluded that there was insufficient evidence to show that plaintiff was disabled prior to her date last insured. AR at 17; *see also* AR at 76 (Dr. Hutcheson stating that "[m]ost of the evidence on file pertain[s] to treatments after the [date last insured] period. Available evidence for the relevant period [is] not enough to make a determination on the DIB claim . . ."); *id.* at 87 (Dr. Darden finding that "there is insufficient evidence to make a determination on this claim."). The SSA advises that if a claimant does not give "the medical and other evidence that we need and request, we will have to make a decision based on information available in [claimant's] case." 20 C.F.R. § 404.1516. The ALJ gave "partial weight" to these opinions because "they were consistent with the evidence available at the time both opinions were formed," but noted that subsequent evidence—unavailable at the time the consultants reviewed the record—did indicate some exertional limitations prior to the date last insured, which the ALJ considered in making his RFC determination. *Id.* at 17.

Plaintiff argues that this reference to subsequent evidence "seems to indicate that the ALJ would give some credence to the opinions of Dr. Kendall and Dr. Tuwiner, in that subsequent evidence justified a re-evaluation" of plaintiff's credibility regarding reported symptoms during the relevant period in 2007. Pl. Br. (Dkt. No. 13) 20. Plaintiff misconstrues the ALJ's words. The ALJ was not referencing evidence "subsequent" to the date last insured, but rather "subsequent" to the consultants' review of the record but before December 31, 2007. AR at 17, citing *id.* at 482-83 (lab results dated October 31, 2007) *id.* at 489-90 (lab results dated August 21, 2007); *id.* at 1406 (Dr. Hart's phone consultation notes dated September 14, 2007). The ALJ relied on these pieces of evidence—beyond what the consultants considered—to conclude that plaintiff had some

24

functional limitations prior to the date last insured. AR at 16-17. Thus, the undersigned finds that the ALJ's assignment of weight to the state agency opinions is supported by substantial evidence in the record.

### c.     Vocational Expert Opinion

Lastly, plaintiff argues that the ALJ failed to include all of her alleged limitations in the hypothetical questions to the VE. Pl. Br. (Dkt. No. 13) 21-22. Specifically, plaintiff argues that the ALJ's "reduced sedentary hypothetical" did not accurately reflect her actual limitations. *Id.* at 20-21. "It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments." *See Russell v. Barnhart*, 58 Fed. Appx. 25, 30 (4th Cir. 2003) (citing *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989)). Specifically, "[w]hile the questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record." *Id.* (internal citations omitted). The ALJ must generally accept evidence from a VE, who, based on the claimant's age, education, work experience, and RFC, testifies as to whether there are any jobs for such a person in the national economy. *See* 20 C.F.R. § 404.1520(g)(1).

Plaintiff argues that the ALJ failed to consider her testimony as well as her husband's letter, which stated that she would be off task at least 15% of an eight-hour work day, when posing hypothetical questions to the VE. Pl. Br. (Dkt. No. 13) 22-23. Based on that evidence, "all work was eliminated." *Id.* at 20. Contrary to plaintiff's argument, the ALJ did consider her impairments *supported by the record* when creating the hypotheticals to pose to the VE. As explained above, the ALJ considered the evidence in the record, including the treatment records and medical opinion evidence as well as plaintiff's and her husband's subjective statements, to determine plaintiff's impairments and to tailor the appropriate questions to the VE. Accordingly, there is substantial

evidence in the record to support the ALJ's hypothetical questions to the VE.

## IV.    Recommendation

For the reasons set forth above, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 13) be DENIED, that defendant's Cross-Motion for Summary Judgment (Dkt. No. 14) be GRANTED, and that the final decision of defendant be AFFIRMED.

## V.    Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge

Michael S. Nachmanoff
United States Magistrate Judge

September 18, 2019
Alexandria, Virginia